STATE of Missouri, Respondent,

v.

Wayne Samuel GRAY, Appellant.

No. 49006.

Supreme Court of Missouri,

Division No. 1.

March 12, 1962.

Al Mendelson, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., Robert D. Kingsland, Asst. Atty. Gen., Jefferson City, for respondent.

DALTON, Presiding Judge.

Defendant was convicted of the crime of incest and his punishment fixed at two years' imprisonment in the state penitentiary. Section 563.220 RSMo 1959, V.A.M.S. He has appealed and first contends that the court erred in overruling his motion for judgment of acquittal at the close of all the evidence. Supreme Court Rule 26.10, V.A.M.R.

Defendant insists that, as a matter of law, the evidence is not sufficient to sustain a judgment of conviction of the offense charged, because "the evidence of the prosecutrix was extremely conflicting and contradictory and, further, * * * her testimony was not corroborated in any way." State v. Tevis, 234 Mo. 276, 136 S.W. 339 is cited in support of the contention.

On February 4, 1961, the defendant, age fifty-four years, and his wife Martha, both of whom had been previously married, resided at 4053 Central Street in Kansas City Missouri, with their two daughters, M—— K——, the prosecutrix, age thirteen years, and B—— S——, age eight years. The house, an old one, had been remodeled by defendant, who was a self-employed general contractor engaged in "home repair," such as painting, paperhanging and carpentry work. The house contained a two-room apartment on the south, occupied by Mr. and Mrs. Guy Lee; a two-room apartment and a hall on the north, occupied by defendant and his family; and a second floor apartment occupied by a Mr. Grant. A bathroom and toilet was shared by the two first-floor apartments. It could be entered either from the hall or from the kitchen of defendant's apartment. One room of defendant's apartment was used as a bedroom

and the other as a kitchen. At the time in question, a cot or daybed had been temporarily placed in the kitchen. There was a swinging door between the bedroom and the kitchen that was usually left open. In the bedroom there was a bed used by defendant and his wife and also a bunk bed. The upper bunk of the bunk bed was ordinarily used by M—— K—— and the lower bunk by B—— S——. M—— K—— reached her thirteenth birthday on September 22, 1960. She was in the seventh grade and attended Rollins School, located at 4005 Main Street.

A few days before February 4, 1961, defendant's granddaughter, Billy Ray Partin, became ill and was brought to defendant's home for care and treatment. She was the child of M—— K——'s half sister. On Friday night, February 3rd, Billy Ray was sleeping in the lower bunk of the bunk bed and there was a type of sheet over the lower bunk with "an inhaler burning." A small light was on all night in the bedroom. Billy Ray's illness also required the presence of a doctor that night, Dr. Casebolt. B—— S——, who was also ill, slept in the top bunk and M—— K—— slept in the kitchen on "sort of a daybed." M—— K—— went to bed about 8 or 9 p. m. but her mother was up and down most of the night.

M—— K—— testified that on Saturday morning February 4, about 7 o'clock, her father, the defendant, came to the kitchen and woke her up. No one else was up at that time. He had on only his shirt. She was wearing pajamas. The door between the kitchen and bedroom was closed. He told her to get up, take off the bottoms of her pajamas and lie back down. He then had sexual intercourse with her. He put on a "rubber plastic thing," a type of covering, before "he interjected body into me." She said the same thing had happened before and, over a long period, about "three times a week for three years."

She told Mr. Cross, her next door neighbor, about her relations with her father and he suggested that she tell Mrs. Cross. She told Mrs. Cross two or three days after the Saturday morning occurrence. Mrs. Cross suggested that she tell the principal of her school. She did so early the next week. Thereafter two police officers came to the school and she was taken to the Youth Bureau and from there to the Homicide Bureau, later back to the Youth Bureau and then over to the Detention Home. She later appeared before Judge Riederer in the juvenile court. She was staying at the Detention Home at the time of the trial.

Mr. Cross, the next door neighbor, had a garage in which he kept pianos, re-built pianos and electrified player pianos. M—— K—— had a dog which Mr. Cross was keeping for her at the garage, since her father would not let her keep it at home. She said she would go over to the garage about every other night to listen to the pianos and to see her dog. She also visited the Cross home often. Mr. Cross had been to the Juvenile Home to see her and he had written her letters. She denied that she had received "love letters" from him. She said: "His wife and him wrote letters", and that both of them would say "with love."

Before reviewing the evidence which appellant relies upon as being conflicting and contradictory, we shall review certain evidence which the jury could consider as corroborative of M—— K——'s testimony.

Dr. William Allen, M. D., made a vaginal examination of prosecutrix on February 10, 1961. He inserted a speculum into the vagina and used it to open the external orifice so as to make a visual examination of the interior of the vagina. The speculum was introduced without any apparent difficulty and it was his opinion that in all probability the hymen was not there or had been ruptured.

One Robert H. Keys, a detective in the Homicide Unit, interviewed the defendant at the police station on February 9, after his arrest, and took a statement from him. The statement was signed and sworn to. After testimony had been received at the

trial concerning matters which preceded the taking of the statement, it was offered and received in evidence without objection.

The statement is, in part, as follows: "Q  Are you willing to waive that right (to consult attorney and friends) and make a statement with reference to the sexual relations you have had with your daughter, M—— K—— Gray, age 13, on February 5, 1961 at about 6:00 a. m., knowing that it can be used against you in court in the event of a trial?  A  Yes, sir.  Q  Now, Wayne, tell me in your own words what has occurred between you and your daughter, sexually, and when did it start?  A  This situation started after I rented out an apartment on the first floor in my house in November of 1960.  This made crowded living quarters.  I have had trouble with my back and when I get home from work my wife, Martha, or M—— K—— rubs my back.  Around the first of November, 1960, M—— K—— was rubbing my back and Martha was getting supper in the kitchen.  While M—— K—— was rubbing my back I turned over on my back and M—— K—— grabbed hold of my penis and squeezed it and rubbed up against me. I in turn touched her breasts and then touched her stomach down to her hair and then on her privates.  Martha came in about that time and I quit.  Q  Have you had any relations with M—— K—— other than this time?  A  Yes, in February of this year.  Q  Tell me what happened in that situation.  A  Last Friday or Saturday morning M—— K—— got up and went to the bathroom.  I was getting breakfast in the kitchen where she had been sleeping. I had to go to the bathroom and I called to her to come out.  I met her at the kitchen door.  Q  Then what happened?  A  I kissed her and she kissed me.  I may have put my hand on her breasts, but that's all I remember.  Q  Have you ever touched M—— K——'s privates or had intercourse with her, other than in November?  A  No, sir.  Q  Is there anything else you wish to add to this statement?  A  No, sir. Q  Will you read and sign this statement?

A  Yes, I have read the above statement, understand it, and am signing it because it is the truth.  (Signed) Wayne S. Gray."

Witness Keys testified that he discussed the charge in question with defendant before the statement was reduced to writing; that he wrote out the questions in longhand and then wrote out the answers "word for word as he (defendant) said them"; and that as they went along he told defendant "we just wanted to get his side of the story. * * * I asked the questions and he answered them * * * those are the words of Mr. Gray."  In the conversation preceding the taking of the statement, the defendant had denied intercourse with his daughter, said he wasn't sure about touching his daughter's breasts and, with reference to the alleged happenings about November first, "he said he quit" when his wife came in.

Defendant, a witness in his own behalf, identified his signature on State's Exhibit No. 1, but said he didn't have his glasses with him when he signed it.  He later said the statement was not his exact words, but said: "I helped him word the statement there, yes, sir."

As to his interview by Keys, the record shows that defendant testified: "Q  In fact, he told you he was giving you a chance to tell your side of the story?  A  That is right.  A  He didn't try to put a word in your mouth, did he?  A  No, sir.  When he wrote that, now, he was going to help word it there, I don't know what word he used exactly, I don't remember.  He didn't use any force against me at that time, no, sir.  Q  What he wrote down here is what you told him?  A  Yes, sir."

Defendant further said: "He (Keys) helped word the statement.  I am not denying that I told him this thing but he helped word that statement, he done the writing, I didn't write it. * * * Those are not my exact words, I am not denying that statement, I told him of a situation like this, an incident, he asked me if I ever remembered touching my daughter.

I admitted that those are not my exact words."

In determining the sufficiency of the evidence to make a case for the jury, an appellate court considers as true the evidence favorable to the State and the favorable inference to be reasonably drawn therefrom and rejects evidence contrary to and in conflict with such favorable evidence. State v. Akers, Mo.Sup., 328 S.W.2d 31, 33. It is, therefore, unnecessary to review that part of defendant's testimony which is directly contradictory of the testimony of the prosecutrix. Some of the defendant's evidence, however, tends to support portions of the State's Exhibit No. 1 and the evidence with reference to it.

At the trial the defendant sought to explain the incidents mentioned by him in State's Exhibit No. 1. Concerning the occurrence on the first of November, 1960, he said: "I was lying on my back at the time that I was touched. Martha had been rubbing my back, she was getting supper. * * * M—— K—— was rubbing my back * * * I turned over. I was wearing two-piece underwear * * * I was not exposed, M—— K—— touched me suddenly like that on this lower part of my body here (indicating). All of a sudden I threw my hand up like this, I touched about her stomach. * * * M—— K—— was wearing blue jeans and double sweater, it was cold wintertime. * * * My wife was in there within five or six feet of me. I told my wife about it, she was there." As to why he felt compelled to tell his wife about it, he said: "Well, because it was unusual, I had never had anything happen like that before." At another time the defendant said: "She was rubbing my back and I turned over on my back * * * she touched down to the long part and I touched her breast like that, I was lying flat on my back. My wife was there." With reference to his written statement, he further said: "I didn't use that word grabbed, I said she touched my penis, I was fully dressed, she never touched my skin."

Concerning the occasion on Saturday morning, February 4, 1961, defendant said: "Now, on Saturday morning my daughter came out of the kitchen, we were all up, I was dressed, she was dressed, I called to her to come out of the bathroom. She had the bathroom tied up, I wanted in there. She came out. I might have kissed her, I don't remember, I told him that I might have kissed her. I kissed her every morning when she goes to school or when I leave both of my children. That is customary." As to whether or not he touched her breasts, he said: "I am not positive about it * * *."

The inconsistencies in M—— K——'s testimony as pointed out in appellant's brief are not sufficient to defeat the submission of the State's case to the jury. The inconsistencies mentioned in the motion for a new trial are that she had stated earlier that her father had had relations with her two or three times and later stated he had had sexual relations with her two to three times a week for three years; that at one time she had stated the specific act submitted in the State's instruction occurred at 2:30 a. m. and then changed her story and stated it occurred at 7 a. m.; that she had once stated that, on the 4th day of February, "her father carried her to the kitchen and later testified that she was already in a bed in the kitchen when the act occurred."

The alleged inconsistencies relied on in the motion and in the brief arose during the cross-examination of prosecutrix with reference to testimony she had given in a deposition and at the preliminary hearing. While transcripts had apparently been made of her testimony, the transcripts were not filed in the case and no portion of either transcript was offered in evidence. Cross-examination was conducted by reading certain questions and answers from the transcripts, and it is difficult to determine the materiality or extent of any conflicts with her previous testimony at the trial. In some instances it appears that she was

testifying as to different occurrences, one of which she said happened two days before the incident upon which the prosecution was based. The court asked for a copy of the transcript of the preliminary hearing in order that he might follow it during the cross-examination but none was available. Some confusion resulted from the type of cross-examination carried on because it is difficult or impossible to determine with reasonable certainty what prosecutrix's prior testimony had been with reference to the specific matters she was being cross-examined about.

The prosecutrix's testimony was not conflicting and contradictory concerning the fact that her father had sexual intercourse with her on Saturday morning, February 4, 1961. Such conflicts or inconsistencies as appear from the transcript of her testimony relative to other matters go only to the weight and value of her testimony. While corroboration was unnecessary, State's Exhibit No. 1 tending, as it does, to show the existence of an unnatural feeling between defendant and his thirteen-year old daughter and to further show the prompt termination of acts evidencing such feelings upon the sudden appearance of defendant's wife was clearly corroborative of the prosecutrix's testimony. The exhibit also tended to show that the unnatural feeling and relationship between the parties existed on February 4, 1961. We find nothing contrary to known physical facts and nothing impossible or unreasonable in prosecutrix's testimony at the trial. Somewhat similar facts are frequently presented in this type of case. And see State v. Thomas, 318 Mo. 843, 1 S.W.2d 157, 159, 160(3, 4); State v. Weekly, Mo.Sup., 223 S.W.2d 494, 495. From a careful review of the record presented we have reached the conclusion that the court did not err in overruling the motion for judgment of acquittal at the close of all the evidence. State v. Akers, supra, 328 S.W.2d 31, 33.

■ Appellant further contends that the court erred in not sustaining defendant's motion for a new trial on the ground of newly discovered evidence. The record shows that the jury returned its verdict on April 27, 1961; that defendant's motion for a new trial was filed on May 16, 1961; and that on June 7, 1961, and prior to the court's ruling on the motion for a new trial, the defendant filed an affidavit asking a new trial on the ground of newly discovered evidence. The affidavit was based on a letter signed by the prosecutrix and addressed to the trial judge and on a letter by a Mrs. Bewley of the "Parental Home" to prosecutrix. A hearing was held on the motion on June 9, 1961.

Mrs. Bewley testified that she was a supervisor in the Social Service Department of the Jackson County Juvenile Court; that she delivered M—— K—— to Girls Town at Mountain Grove, Missouri; that she had corresponded with her since; that the letter she had written to M—— K—— was in reply to a letter she had received from M—— K——, which letter stated, with reference to Mr. Cross: "I thought he was the only one that I could ever love and I thought he loved me very much and I loved him very much. He told me Mrs. Cross left him with another man and went to Ohio or someplace I don't know exactly. He told me he didn't think Mrs. Cross loves him but he knows I love him. I had relations with in the last year and a half." The witness further stated that, although she had talked to M—— K—— many times about her testimony at the trial, M—— K—— had never in any way changed her story, as given at the trial, nor had she denied having had sexual relations with her father.

The trial judge had not seen the letter addressed to him until it was presented to him at the hearing on the motion. It was attached to defendant's affidavit asking for a new trial on newly discovered evidence. Defendant's evidence shows that Mrs. Gray, M—— K——'s mother, had been to Mountain Grove on June 4th with defendant and B—— S—— and had brought the letter back with her. The

letter was written by M—— K—— in her mother's presence; her father had visited her but, according to Mrs. Gray, he was not present when the letter was written. Mrs. Gray said the letter was M—— K——'s idea—she thought of it herself. The letter stated that Mr. and Mrs. Cross had persuaded her to tell the story about her father and that it was a "fib" and she wanted to drop the charges.

The court took the motion for new trial under advisement in order that he might hear M—— K——'s testimony. Her testimony was heard on July 14, 1961. She admitted writing the letter addressed to the trial judge. She said that her mother, father and sister were there the day the letter was written. They visited her from about 1 p. m. to 6 or 7 p. m. on Sunday, June 4, 1961, and the letter was written just before they left for home. It was written at the suggestion of her father and mother. The letter was not her idea. She wrote the letter because her father was yelling at her and she was afraid. It was addressed to the judge, but they took it with them. She testified that she had not told any false story about her father at the trial; that what she said at that time was true; and that what she said in the letter to the trial judge was false. She also said she had lied to Mrs. Bewley as to one matter, about Mr. Cross, but that Mr. Cross had had intercourse with her four times in a year and a half. On further examination by the court the prosecutrix insisted that at the trial she had told the truth about her father. The motion for a new trial was then overruled and defendant was sentenced in accordance with the jury's verdict.

■ Appellant argues that the evidence adduced at the hearing on the motion for a new trial conclusively shows that the prosecutrix was unworthy of belief; and that for a jury to properly weigh and evaluate the evidence they should have had all of the facts of her relationship with Mr. Cross. So far as the record on appeal shows, the prosecutrix was not asked about any improper relations with Mr. Cross when her deposition was taken, when the preliminary hearing was held, nor at the trial. Counsel for defendant did cross-examine prosecutrix at the trial about alleged "love letters" from Cross, about reporting to him about her relations with her father, about Mr. Cross' visit to her at the Juvenile Home, about her frequent visits to his house and about her visits to his garage every other night. The record shows sufficient facts to put counsel on notice to inquire about other matters, if he considered them material to the issues on trial. The only evidence presented at the hearing on the motion in conflict with prosecutrix's testimony at the trial was her letter to the trial judge, which her parents obtained from her when they visited her at Mountain Grove. She repudiated that letter at the hearing. So far as appears from this record the trial judge gave the letter all of the consideration that it properly deserved.

■ Appellant further argues that the testimony at the hearing on the motion for a new trial concerning prosecutrix's sexual relations with Mr. Cross was extremely important because it tended to "absolutely destroy" any corroborative effect of Dr. Allen's testimony; that evidence of her relations with Mr. Cross would have caused a different verdict; and that, whether true or false, it shows she was making accusations against a neighbor as well as her father. In our view the evidence was insufficient to show that in the event of a new trial the newly discovered evidence would likely produce a different result. The jury, if they believed her testimony, might well consider the child's relationship with the neighbor to have been the natural and expected result of her degrading experiences with her father, which she said had existed over twice as long a period of time as her relations with Mr. Cross. Further, the fact that the child may have been guilty of improper relations with Mr.

Cross was no defense to the charge of incest. State v. Winingham, 124 Mo. 423, 27 S.W. 1107, 1108(3). Further, the evidence developed at the hearing on the motion did not show reasonable diligence on the part of defendant to develop some of the facts developed at the hearing on the motion. The court did not err or abuse its discretion in overruling defendant's motion for a new trial on the ground of newly discovered evidence. State v. Brown, Mo. Sup., 245 S.W.2d 866, 868(9, 10); State v. Stroud, 362 Mo. 124, 240 S.W.2d 111, 113(5, 6).

We have also examined those matters required to be considered under Supreme Court Rule 28.02, and find no error.

The judgment is affirmed.

All concur.